**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

---

**No. 98-31105**

---

LISA MARIE HOLLOWELL; TERRENCE PIERCE;
EMMA CHESS, on their own behalf and on behalf
of all similarly situated employees,

Plaintiffs-Appellees,

VERSUS

ORLEANS REGIONAL HOSPITAL LLC; ET AL

Defendants,

ORLEANS REGIONAL HOSPITAL LLC; NORTH LOUISIANA
REGIONAL HOSPITAL INC.; MAGNOLIA HEALTH SYSTEMS LLC;
PRECISION INC.; SUCCESS COUNSELING SERVICES LLC;
NORTH LOUISIANA REGIONAL HOSPITAL PARTNERSHIP;
WILLIAM C. WINDHAM; RICHARD W. WILLIAMS; JOHN TURNER;
BRENTWOOD BEHAVIORAL HEALTHCARE LLC,

Defendants-Appellants.

---

**No. 99-30123**

---

LISA MARIE HOLLOWELL; TERRENCE PIERCE; EMMA CHESS, on their own
behalf and on behalf of all similarly situated employees,

Plaintiffs-Appellees,

VERSUS

ORLEANS REGIONAL HOSPITAL, Etc.; ET AL

Defendants,

RICHARD W. WILLIAMS; PRECISION INC.,

Defendants-Appellants.

Appeals from the United States District
Court for the Eastern District of Louisiana, New Orleans

July 18, 2000

Before POLITZ and DAVIS, Circuit Judges, and RESTANI,[*] Judge:

RESTANI, Judge:

This case involves the interpretation of various provisions of the Worker Adjustment and Retraining Notification Act ("WARN"), 29 U.S.C. § 2101 (1994), et seq., as well as the application of Louisiana corporate law on piercing the corporate veil of a limited liability company. The case arises out of the closure of Orleans Regional Hospital ("ORH") on November 3, 1995. Lisa Marie Hollowell, along with other former employees of ORH, filed suit against ORH and a variety of individuals and limited liability companies asserting WARN Act claims.

**Background**

Orleans Regional Hospital was a medicaid funded psychiatric hospital located in New Orleans, which primarily served adolescents and children. ORH was a limited liability company[1]

_____

[*] Judge of the United States Court of International Trade, sitting by designation.

[1] Limited liability companies ("LLCs") are essentially corporations which the Louisiana tax code taxes as partnerships. See La. Rev. Stat. Ann. § 12:1301, et seq. (West 2000); Susan Kalinka, The Louisiana Limited Liability Company Law After "Check-the-Box", 57 La. L. Rev. 715, 715 (1997) (noting popularity of LLC because it offers investors limited liability
(continued...)

under Louisiana law.  It was established in November 1993 with three members: another limited liability company, NORS LLC,[2] and two corporations, North Louisiana Regional Hospital, Inc. ("North Louisiana, Inc."), and Precision, Inc. ("Precision").  John C. Turner and William C. Windham, defendants in this action, each held a fifty percent interest in North Louisiana, Inc.  Richard W. Williams, also a defendant, was the sole shareholder of Precision.

Together North Louisiana, Inc. and Precision also owned North Louisiana Regional Hospital Partnership ("NLRHP"), a hospital located in Shreveport.  NLRHP began operations in 1992. NLRHP treated adolescents with psychiatric and chemical dependence disorders, and received Medicaid reimbursements. North Louisiana, Inc. and Precision also formed Magnolia Health Systems, LLC ("Magnolia"), in January 1994.  Magnolia provided management services to ORH and NLRHP, and developed other health-related business.

In 1994, changes in Medicaid policy began affecting the admission and length of stay at psychiatric hospitals.  The patient census at ORH began to drop as a result of these changes,

_____

[1](...continued)
of corporate shareholders and partnership classification for tax purposes).

[2]     Plaintiffs had originally included NORS as a defendant in this action, but voluntarily dismissed their complaint against NORS.

and ORH began discharging employees.  During this period, ORH began providing outpatient services through Spectrum Community Counseling, LLC and Success Counseling Services, LLC (which were the same program).  Williams, Windham, and Turner, along with administrators from ORH and NLRHP were members of the Success/Spectrum governing board.

The patient census at ORH continued to decline in 1995, and Williams, Windham, Turner and Peters decided to close ORH in October 1995.  Prior to notifying the ORH employees of the shutdown, the CFO at Magnolia calculated a cash distribution of $1.5 million for Turner, Williams, and Windham, based on the combined assets of NLRHP, Success, ORH, and Magnolia.  ORH employees were notified on October 27, 1995 of ORH's shutdown, and the majority of ORH employees left the hospital on November 3, 1995.  Turner and Windham subsequently formed another limited liability company, Brentwood Behavioral Healthcare, LLC ("Brentwood"), which assumed NLRHP's hospital license and medicaid provider agreement when NLRHP dissolved in 1996. Plaintiffs brought this action against ORH and the various other LLCs, corporations, and individuals, for failure to provide them with 60-days notice of ORH's closing.

## Discussion

### I. WARN Act claims

The district court granted in part and denied in part

4

defendants' motion for summary judgment and plaintiffs' motion for partial summary judgment.  We review the grant of summary judgment de novo.  Carpenters Dist. Council v. Dillard Dep't Stores, 15 F.3d 1275, 1281 (5th Cir. 1994).

The WARN Act prohibits employers from ordering a "plant closing or mass layoff until the end of a 60-day period after the employer serves written notice" of the closing or layoff to its employees.  29 U.S.C. § 2102(a).  An employer who violates this notice provision is required to provide "back pay for each day of violation."  29 U.S.C. § 2104(a)(1).  "In short, WARN imposes a statutory duty on businesses to notify workers of impending large-scale job losses and allows for limited damages 'designed to penalize the wrongdoing employer, deter future violations, and facilitate simplified damages proceedings.'" Staudt v. Glastron, Inc., 92 F.3d 312, 314 (5th Cir. 1996) (citation omitted). Defendants assert that the district court erred in finding that a "plant closing," had occurred at ORH, and in finding that ORH was an "employer," as both terms are defined by the WARN Act.  The other issues decided by the district court at summary judgment are not before us on appeal.[3]

Section 2101(a)(2) of Title 29 defines the term "plant closing" as "the permanent or temporary shutdown of a single site

---

[3]  These include the finding that no mass layoff had occurred pursuant to 29 U.S.C. § 2101(a)(3) and that Turner, Windham and Williams could not be held directly liable under WARN.

5

of employment . . . if the shutdown results in an employment loss at the single site of employment during any 30-day period for 50 or more employees excluding any part-time employees."  ORH shut down on November 3, 1995.  In the 30 days preceding the shutdown, 48 employees were terminated.  Therefore, there was not a shutdown of ORH pursuant to 29 U.S.C. § 2101(a)(2).  The district court found, however, that there was a plant closing as defined by 29 U.S.C. § 2102(d).  This section provides:

> [I]n determining whether a plant closing or mass layoff has occurred or will occur, employment losses for 2 or more groups at a single site of employment, each of which is less than the minimum number of employees specified in section 2101(a)(2) or (3) of this title but which in the aggregate exceed that minimum number, and which occur within any 90-day period shall be considered to be a plant closing or mass layoff unless the employer demonstrates that the employment losses are the result of separate and distinct actions and causes and are not an attempt by the employer to evade the requirements of this chapter.

Defendants contest the district court's conclusion that a plant closing occurred pursuant to § 2102(d).

Defendants first argue that they presented credible evidence that lay-offs prior to October 24, 1995 were for "separate and distinct causes."  Defendants rely on statements made by Scott Blakley, the ORH administrator, in his affidavit.  Blakley stated that the layoffs which occurred before October 24, 1995 were the result of separate and distinct actions because "they were the result of adjusting the staffing to correspond with the current patient census."  "[T]hese layoffs were simply the result of a business decision to adjust the employee census to account for

the decline in the hospital's patient census."  Blakley stated that no decision was made to close the hospital prior to October 24, 1995.  Blakley stated that ORH tried to pursue new business opportunities which would have kept the hospital open, but that those efforts failed.

Section 2102(d) imposes an affirmative burden on the employer to prove that the court should disaggregate employment losses that occurred during the 90-day period.  As the district court noted, "[e]ven assuming that ORH did not make the final decision to shutdown its employment site until October 24, 1995, this fact does not establish that the employment losses which preceded this date were wholly unrelated to the shutdown." Blakley's statement does not prove that separate and distinct actions and causes led to the pre-October 24, 1995 lay-offs. Indeed, his statements support the conclusion that ORH's declining profitability due to changes in Medicare reimbursements led to the shutdown.  Blakley's October 27, 1995 memorandum to all the ORH employees stated that it was the "reductions in Medicaid support for poor children [which] resulted in a reduction in work force and the loss of your employment."  As noted by one district court, "layoffs that are occasioned by a continuing and accelerating economic demise are not the result of separate and distinct causes."  United Paperworkers Int'l Union v. Alden Corrugated Container Corp., 901 F. Supp. 426, 436 (D. Mass. 1995).  Defendants failed to produce evidence that created

7

a genuine issue of material fact tending to show that the layoffs were due to separate and distinct causes.

Defendants also argue that fewer than 50 employees were terminated during the 90-day period, therefore no plant-closing occurred. Defendants maintain that the district court incorrectly aggregated the pre-October 24 layoffs because the court counted each individual employee that ORH laid off, rather than each "group" of employees. When aggregating employment losses, 29 U.S.C. § 2102(d) allows courts to consider "employment losses for 2 or more groups at a single site of employment, each of which is less than [50 employees]," which occur in a 90-day period. Focusing on the word "groups," defendants argue that the court should not count any single individual laid off on any given day because an individual cannot constitute a group. See Webster's Third New Int'l Dictionary 1004 (1981) (defining group as "two or more figures . . . forming a distinctive unit"). Excluding the employees laid off on a day when no other employees were terminated leads to a total of 48 layoffs in the 90-day period. Including those employees leads to a total of 62 layoffs within the period.

The district court interpreted 29 U.S.C. § 2102(d)'s use of the word "groups" as referring to the group of employees within the 30-day period and the group of employees outside of the 30-day period, but within the 90-day period. Other than their reliance on the dictionary definition of the word "groups,"

8

defendants have not presented any argument for why this court should adopt their interpretation of § 2102(d). Adopting defendant's interpretation would lead to the anomalous result that an employer could terminate more than 50 employees in the 90-day period, but yet not be subject to WARN if the employer terminated the employment of each individual employee on a different day. We conclude that the district court's interpretation is more in keeping with the purpose of the WARN act, which is to notify employees of large-scale job losses, and therefore agree that ORH experienced a "plant-closing."

Defendants also contest the district court's conclusion at summary judgment that ORH was an "employer" as defined by WARN. Section 2101 defines an employer as "any business enterprise that employs - (A) 100 or more employees, excluding part-time employees; or (B) 100 or more employees who in the aggregate work at least 4,000 hours per week (exclusive of hours of overtime)." 29 U.S.C. § 2101(a)(1). Defendants contest that there was adequate evidence presented to the district court that they employed 100 or more employees. The Department of Labor's regulations, promulgated under WARN, state that "[t]he point in time at which the number of employees is to be measured for the purpose of determining coverage is the date the first notice is required to be given." 20 C.F.R. § 639.5(a)(2) (1999). The regulations also state that "[w]hen all employees are not terminated on the same date, the date of the first individual

9

termination within the statutory 30-day or 90-day period triggers the 60-day notice requirement."  20 C.F.R. § 639.5(a)(1).  The first individual termination in the 90-day period occurred on August 9, 1995.  This individual was entitled to notice 60 days earlier, that is June 10, 1995.  The district court therefore concluded that June 10, 1995[4] was the relevant date for determining whether ORH was an employer within the meaning of WARN.

The evidence of employment levels is contained in ORH's payroll statements.  Defendants do not contest the accuracy of the payroll statements, rather they assert that the payroll for the two-week period June 1-15, 1995, does not establish that more than 100 individuals were employed by ORH.  Excluding overtime hours worked during this period, ORH employees worked an average of 5564.25 hours per week.[5]  This is well over the 4,000 hours required under 29 U.S.C. § 2101(a)(1)(B), which qualifies ORH as an employer.[6]

_____

[4]     Defendants focus on June 4, 1995 as the relevant date, that is 60 days before the 90 day shutdown period.  Whether June 4 or June 10 is used does not change the analysis.

[5]     These hours are calculated by adding the total number of hours worked in the period (12241.35) and dividing by the number of work days (11) which leads to an average of 1112.85 hours worked per day, multiplied by 5 equals an average of 5564.25 hours per week.  Employees who worked more than 88 hours in the period were calculated as having only worked 88 hours in order to exclude their overtime hours.

[6]     Defendants dispute this calculation of hours worked
(continued...)

Although defendants state that they presented contrary evidence to the determination that ORH was an employer, defendants fail to cite to the record or describe such evidence. The record before us presents no genuine issue of material fact that ORH did not employ over 100 employees on June 10, 1995, thereby rendering ORH an employer pursuant to WARN.

The district court properly determined at summary judgment that ORH was subject to the WARN notification requirement.

## II. Trial issues

At summary judgment, the district court found that the limited liability "veil" of protection could be pierced if ORH was acting as the alter ego of ORH's members. The court, however, found that such a determination involved a fact-intensive review of the relationships among the ORH members. The district court also found there to be factual issues regarding whether ORH and other companies (but not the individual defendants) operated as a "single business enterprise." Likewise, the issue of whether Brentwood assumed the liabilities of NLRHP or ORH was a disputed issue of fact.

After trial, the jury found Precision and North Louisiana, Inc. to be the alter egos of ORH and responsible for ORH's debts.

---

[6](...continued)
because it includes hours worked by part-time employees. Part-time employees are excluded from the calculation under 29 U.S.C. § 2101(a)(1)(A), but subpart (B) of section 2101(a)(1) makes no distinction between part-time and full-time employees when aggregating hours worked.

11

The jury also found Williams to be the alter ego of Precision, and Windham and Turner to be the alter egos of North Louisiana, Inc. The jury found that Precision, North Louisiana, Inc., Magnolia, NLRHP and Success constituted a "single business enterprise." Regarding Brentwood, the jury found it to be the successor to NLRHP and responsible for NLRHP's liabilities.

The district court denied defendants' motion for judgment as a matter of law pursuant to Fed. R. Civ. P. 50(b) and their motion for a new trial, pursuant to Fed. R. Civ. P. 59. We review the Rule 50(b) motion using the same standards as the district court, and reverse only if the jury could not reach the conclusion it did. Hiltgen v. Sumrall, 47 F.3d 695, 699 (5th Cir. 1995) ("jury verdict must be upheld unless 'there is no legally sufficient evidentiary basis for a reasonable jury to find' as the jury did.") (citing Fed. R. Civ. P. 50(a)(1)); see also Brock v. Merrell Dow Pharms., Inc., 874 F.2d 307, 308 (5th Cir. 1989) (judgment notwithstanding the verdict proper "only when there can be only one reasonable conclusion drawn from the evidence").

**A) Alter ego**

The question of whether to pierce the corporate veil is primarily one of fact and therefore a very deferential standard of review applies. Huard v. Shreveport Pirates, Inc., 147 F.3d 406, 409 (5th Cir. 1998). Defendants argue, however, that as a

12

matter of Louisiana law, a court may not pierce the corporate veil in the absence of either fraud or one of five specific factors.  We review these questions of law <u>de novo</u>.  <u>Randel v. United States Dep't of the Navy</u>, 157 F.3d 392, 395 (5th Cir. 1998).

Corporations function as distinct legal entities, separate from the individuals who own them, and their shareholders are not generally liable for the debts of the corporation.[7]  <u>Riggins v. Dixie Shoring Co.</u>, 590 So.2d 1164, 1167 (La. 1991).  Louisiana law recognizes exceptions to limited liability, and in certain circumstances permits  "piercing the corporate veil" on an alter ego basis.  <u>Id.</u> at 1168.  This usually involves "situations where fraud or deceit has been practiced by the shareholder acting through the corporation."  <u>Id.</u>  The Louisiana Supreme Court stated in <u>Riggins</u> that:

> Some of the factors courts consider when determining whether to apply the alter ego doctrine include, <u>but are not limited to</u>: 1) commingling of corporate and shareholder funds; 2) failure to follow statutory formalities for incorporating and transacting corporate affairs; 3) undercapitalization; 4) failure to provide separate bank accounts and bookkeeping records; and 5) failure to hold regular shareholder and director meetings.

---

[7]      The district court concluded that for alter ego purposes, Louisiana would treat an LLC in the same manner as a corporation.  Neither party disputes this holding.  Commentators also agree that for purposes of piercing the corporate veil, an LLC would be treated like a corporation.  <u>See</u> Kalinka, 57 La. L. Rev. at 794; Eric Fox, <u>Piercing the Veil of Limited Liability Companies</u>, 62 Geo. Wash. L. Rev. 1143, 1167-68 (1994) (noting that most commentators assume that doctrine of piercing the corporate veil applies to LLCs).

Riggins, 590 So.2d at 1168 (emphasis added) (citation omitted).

Defendants maintain that a finding of fraud is essential in order to pierce the corporate veil in a contract action, and further assert that a WARN Act claim is analogous to a contract claim. Several courts have considered the nature of a WARN Act claim in order to determine the applicable statute of limitations. In this context, a WARN Act claim has been compared to a contract claim. See Aaron v. Brown Group, Inc., 80 F.3d 1220, 1225 (8th Cir. 1996) ("WARN action is most closely analogous to an action to recover damages for a breach of an implied contract."); Frymire v. Ampex Corp., 61 F.3d 757, 764 (10th Cir. 1995) (same); United Paperworkers Int'l Union & its Local 340 v. Specialty Paperboard, Inc., 999 F.2d 51, 57 (2d Cir. 1993) (finding no state substantive claim perfectly analogous to WARN, but concluding that contract statute of limitations should be applied). We have noted that a WARN Act claim is not really a contract or tort claim. Staudt, 92 F.3d at 316 ("WARN action is not particularly analogous to either [tort or contract]"). In Staudt we did not need to decide definitively whether WARN was most like a contract or tort action, and we need not do so now either.

Even if the defendants are correct that a WARN action is most akin to a contract action, they are mistaken that Louisiana law requires a finding of fraud in order to pierce the corporate veil in a contract action. While we stated in Subway Equip.

14

Leasing Corp. v. Sims (In re Sims), that fraud is an essential component of an alter ego finding when a contract claim is at issue, Sims did not involve the application of Louisiana law, but rather involved a combination of federal common law, Delaware law and Connecticut law. 994 F.2d 210, 218 n.11 (5th Cir. 1993) (citing United States v. Jon-T Chems., Inc., 768 F.2d 686, 692 (5th Cir. 1985)).[8] In Pine Tree Assocs. v. Doctors' Assocs., Inc., defendants argued that in a case involving a contractual dispute, fraud must be present in order to pierce the corporate veil. 654 So.2d 735, 739 (La. Ct. App. 1995). The Louisiana Court of Appeals rejected this argument, stating that Riggins "establishes that even in situations where there has been no proof of fraud, or allegations of fraud, a court may still apply the 'totality of the circumstances' test to determine whether the corporate veil should be pierced." 654 So.2d at 739. We also noted in Huard that when fraud is not alleged, a plaintiff seeking to pierce the corporate veil "bears a heavy burden of proof in demonstrating that the corporate form has been disregarded," but that Louisiana law "indicates that the corporate veil may be pierced without the presence of fraud."[9]

---

[8] Jon-T Chems. likewise did not involve an application of Louisiana law, but rather involved federal common law and Texas law. 768 F.2d at 690 n.6.

[9] Defendants argue that we should not rely on the statement in Pine Tree Assocs. that Louisiana law does not require a finding of fraud in order to pierce the corporate veil,
(continued...)

15

147 F.3d at 410.

Defendants further argue that the jury's finding that under the totality of circumstances the veils of North Louisiana, Inc. and Precision could be pierced to reach the individual defendants was error because the jury did not find any of the five Riggins' factors present with regard to these individual defendants. The jury found no specific factors present in Turner and Windham's relationship with North Louisiana, Inc., and no specific factors in Williams' relationship with Precision. The jury nevertheless answered "yes" to the question that under the totality of the

---

[9](...continued)

because it represents the position of an intermediate state court. We are bound to apply the law as interpreted by the state's highest court and "[w]hen the state's court of last resort has yet to speak on an issue . . . our task is to determine . . . how that court would rule if the issue were before it." Ladue v. Chevron, U.S.A., Inc., 920 F.2d 272, 274 (5th Cir. 1991). We are bound by the decision of an intermediate state court "when we remain unconvinced 'by other . . . data that the highest court of the state would decide otherwise.'" Id. (quotation omitted).

Defendants also argue that Riggins does in fact reflect the position that fraud is an essential component of a veil piercing claim. For this reading they rely in large part on Judge Dennis' concurring opinion in the denial for rehearing in Riggins. See Riggins v. Dixie Shoring Co., 592 So.2d 1282, 1283 (La. 1992). While Judge Dennis did state that when a contract is involved, "courts have usually applied more stringent standards to piercing the corporate veil," id. at 1285, he did not state that fraud is absolutely necessary. While we recognize that the standard for piercing the corporate veil is more stringent in a contract action than a tort action, we are not convinced that the Louisiana Supreme Court would decide that fraud must be found in order to pierce the corporate veil. We are therefore bound by the holding in Pine Tree Assocs. See also Comment, Piercing the Corporate Veil in Louisiana Absent Fraud or Deceit, 48 La. L. Rev. 1229, 1232-33 (1988).

16

circumstances North Louisiana, Inc. was the alter ego of Turner and Windham, and Precision was the alter ego of Williams. Although the five Riggins factors "are usually considered relevant in evaluating adherence to corporate formalities," Huard, 147 F.3d at 409, Riggins itself recognizes that courts are not limited to these five factors when invoking the alter ego doctrine, 590 So.2d at 1168. Under Louisiana law more than the five factors may be considered. Pine Tree Assocs., 654 So.2d at 738-39 (courts consider the five factors, but are not limited to those factors); Green v. Champion Ins. Co., 577 So.2d 249, 257-58 (La. Ct. App. 1991) (listing eighteen factors which courts consider in determining whether a corporation is the alter ego of another, and noting that list is "illustrative and is not intended as an exhaustive list of relevant factors."); United States v. Clinical Leasing Serv., Inc., 982 F.2d 900, 903 (5th Cir. 1992) (district court did not commit error in adding two factors to alter ego determination because Louisiana courts had recognized additional factors under alter ego theory); see also Glenn G. Morris, Piercing the Corporate Veil in Louisiana, 52 La. L. Rev. 271, 284 (1991) (noting that more than five factors may be considered under the totality of the circumstances).

In denying defendants' Rule 50(b) motion, the district court noted that even though the jury did not find evidence of the five factors:

[T]he jury was presented with ample evidence in which to

17

find that the individual defendants exercised dominion and control over ORH: that the individual defendants held themselves out as the owners and directors of the [ORH] enterprise; that the individual defendants indeed controlled decisions of the ORH enterprise; that the owners profited from the enterprise at the expense of their employees; and that distributions flowed from [NLRHP] to [North Louisiana, Inc.] and Precision and from [North Louisiana, Inc.] and Precision to the individual defendants.

The owners' ability to receive a $1.5 million distribution on the eve of ORH's shutdown further demonstrates their control over ORH, and indeed, all the entities.

The jury may also have considered the individual defendants' use of the companies for non-corporate purposes. For example, the owners charged Magnolia for the purchase and maintenance of an airplane which was solely for their personal use. In 1994, ORH was charged directly for the costs of the airplane and in 1995 Magnolia charged NLRHP, ORH and Success for the airplane fees as part of Magnolia's management fees. Magnolia also pursued other business opportunities for the owners in several Southern states, and the salaries of Magnolia employees were charged to ORH. All of Magnolia's expenses were covered by the management fees paid by ORH, NLRHP, and Success. Furthermore, even if certain evidence cuts against the jury's conclusion, it was for the fact finder to weigh all of the evidence and make the alter ego determination. Jon-T Chems., 768 F.2d at 695-96 ("Although the evidence . . . does not all point in one direction . . . it was for the factfinder . . . to weigh the evidence and to determine, based on the totality of the evidence, whether an

18

alter ego relationship existed"); see also Byles Welding &

Tractor Co. v. Butts Sales & Serv., Inc., 541 So.2d 992, 993-94

(La. Ct. App. 1989) ("When a party seeks to pierce the corporate

veil, the situation must be viewed with regard to the totality of

the circumstances.  Whether individual liability will be assigned

to shareholders is primarily a factual finding to be made by the

trial court.")

Defendants also urge us to set aside the jury's findings

that North Louisiana, Inc. commingled funds with ORH and that

there was evidence of undercapitalization.  The jury found that

North Louisiana, Inc. commingled funds with ORH and that the two

entities failed to maintain separate bank accounts and

bookkeeping records.  Defendants assert that the only evidence of

commingling was between NLRHP and ORH, not between North

Louisiana, Inc. and ORH.  Defendants cite to testimony by

plaintiffs' expert that NLRHP and ORH commingled funds.

Likewise, defendants contest the jury's conclusion that ORH was

undercapitalized.  They assert that the only basis for this

conclusion is the fact that ORH was capitalized with loans from

NLRHP.[10]  Even if we accept defendants' argument, the argument

---

[10]    Defendants maintain that shareholder loans may properly
be considered capital.  See Sea Tang Fisheries, Inc. v. You'll
See Sea Foods, Inc., 569 So.2d 992, 997 (La. Ct. App. 1990)
(stating that interest free loans to corporation from shareholder
were not grounds for piercing the veil).  They also assert that
undercapitalization, in and of itself, is not sufficient reason
to make an alter ego finding.  See McGregor v. United Film Corp.,
                                                   (continued...)

19

fails to take into account the fact that the jury also found that North Louisiana, Inc. and Precision were the alter egos of ORH based on the totality of the circumstances.  Defendants focus their arguments on commingling and undercapitalization and do not present a challenge to the sufficiency of the evidence on the totality finding.  As already discussed, the totality of the circumstances can include factors other than the five enumerated Riggins factors. The district court therefore did not commit reversible error in allowing the jury to consider factors other than the enumerated factors, and in affirming the jury's findings.

## B) Single business enterprise

The jury found that Precision, North Louisiana, Inc., Magnolia, NLRHP and Success, together with ORH, all formed a "single business enterprise" and were therefore liable for ORH's WARN Act violation.  WARN defines an "employer" as a "business enterprise" that has 100 or more employees, but does not further

---

[10](...continued)
351 So.2d 1224, 1229 (La. Ct. App. 1977) (stating that limited or inadequate capitalization "does not of itself indicate fraud or raise any presumption of fraud, deceit or ill practices on the part of a stockholder.")
    We have recognized, however, that continual loans can serve as proof of undercapitalization.  In Jon-T Chems. we stated that "[t]he fact that [a corporation] continually had net operating losses and survived due to massive and ongoing transfusions . . . does not indicate that [the corporation] ever stood on its own two feet.  Quite the contrary; it reinforces the . . . conclusion that [the corporation] did not have any separate financial existence."  768 F.2d at 694-95.

define the term.  See 29 U.S.C. § 2101(a)(1).  The Department of Labor's regulations state that the following factors should be considered in order to determine the independence of subsidiaries and independent contractors from a parent company: "(i) common ownership, (ii) common directors and/or officers, (iii) de facto exercise of control, (iv) unity of personnel policies emanating from a common source, and (v) the dependency of operations."  20 C.F.R. § 639.3(a)(2).[11]  The district court instructed the jury to consider these five factors in order to decide whether the five companies at issue constituted a single business enterprise with ORH.[12]

---

[11]    The DOL explained that "[t]he intent of the regulatory provision relating to independent contractors and subsidiaries is not to create a special definition of these terms for WARN purposes; the definition is intended only to summarize existing law that has developed under State Corporations laws and such statutes as the NLRA, the Fair Labor Standards Act (FLSA) and the Employee Retirement Income Security Act (ERISA).  The Department does not believe that there is any reason to attempt to create new law in this area especially for WARN purposes when relevant concepts of State and federal law adequately cover the issue . . . . Similarly, the regulation is not intended to foreclose any application of existing law or to identify the source of legal authority for making determinations of whether related entities are separate."  Worker Adjustment and Retraining Notification, 54 Fed. Reg. 16,042, 16,045 (1989).

[12]    These factors are similar to those applied in civil rights actions, when determining whether superficially distinct entities may be exposed to liability if they are in fact, a "single, integrated enterprise."  Schweitzer v. Advanced Telemarketing Corp., 104 F.3d 761, 763 (5th Cir. 1997).  The four part test considers "(1) interrelation of operations; (2) centralized control of labor relations; (3) common management; and (4) common ownership or financial control."  Id. at 764; see also International Bhd. of Teamsters v. American Delivery Serv.
(continued...)

21

Defendants primarily argue that there is insufficient evidence to support the jury's finding that the companies constituted a single business enterprise. Defendants also argue, however, that the district court provided the jury with an inaccurate legal standard. They state that common ownership is the least important factor and should not be sufficient reason to consider the companies a single enterprise. See NLRB v. Carson Cable TV, 795 F.2d 879, 881 (9th Cir. 1986) (noting that factors other than common ownership have been stressed by the NLRB). Defendants, however, failed to object to the jury instructions and therefore waived the right to contest those instructions. See Fed. R. Civ. P. 51 ("No party may assign as error the giving or the failure to give an instruction unless that party objects thereto before the jury retires to consider its verdict"). We therefore focus on whether there was sufficient evidence for the jury to determine that the five companies, along with ORH, constituted a single business enterprise.

Defendants concede the common ownership of NLRHP and ORH, but reiterate that common ownership is the least important factor in determining the existence of a single enterprise. We decline to decide the relative importance of the five WARN factors, however, and simply note that the common ownership of NLRHP and

---

[12](...continued)
Co., 50 F.3d 770, 775-76 (9th Cir. 1995) (noting the similarity of "single employer" test under WARN and other federal statutes).

22

ORH supports the jury's finding of a single business enterprise. Although defendants further argue that NLRHP and ORH had separate managers and that the plaintiffs were never supervised by a NLRHP administrator, there is sufficient evidence to uphold the jury's finding.

There is evidence of common management. Magnolia itself was established in early 1994 to manage all of the entities in which North Louisiana, Inc. had an ownership interest. Moreover, Blakley, the ORH administrator, was also Vice-President of Magnolia. The companies were perceived as linked. For example, ORH is referred to as a "sister company" on Timothy Doolin's job description as CFO for North Louisiana. Doolin also referred to Success as a "sister operation" to ORH and NLRHP, which provided complimentary outpatient care to ORH and NLRHP's inpatient services. The record also supports the conclusion that there was a unified employment policy. The employees of the various entities were all covered by the same benefits plan. Employees who moved from one entity to another did not experience a change in coverage, nor did they have to wait a 90-day period to receive their benefits, as required of new employees. Employee insurance documents also listed the policyholder as "North Louisiana Regional Hospital d/b/a Orleans Regional Hospital LLC." Most telling is the fact that the owners themselves conceived of the entities as a single enterprise. When the owners decided to receive a cash distribution in October 1995, the assets and cash

23

from all the entities were considered collectively.  They listed the assets of each entity and added them together and then decided to distribute $1.5 million to the owners.  This decision shows a disregard for the corporate separateness of the entities.

There is a legally sufficient basis for the jury's conclusion that the various entities, NLRHP, North Louisiana, Inc., Success, Precision and Magnolia, along with ORH, formed a single business enterprise.  We therefore affirm the jury verdict on this issue.

## C) Successor liability

In March 1996, Windham, Turner and Blakley established Brentwood Behavior Healthcare, another LLC.  NLRHP assigned certain rights and interests to Brentwood in April 1996.  Among these rights, NLRHP assigned Brentwood its Louisiana hospital license, as well as several medicaid provider numbers, and its managed care contracts.[13]  Pursuant to this assignment, NLRHP avoided liabilities estimated at more than $200,000.  Brentwood began operating a psychiatric hospital on April 1, 1996, in the same facility formerly occupied by NLRHP, in Shreveport, Louisiana.

The district court instructed the jury that under Louisiana law, Brentwood was the "successor company" of either ORH or NLRHP, if "(1) The new company expressly assumed the liabilities

---

[13]  On March 31, 1996 the shareholders of North Louisiana, Inc. had approved the assignment from NLRHP to Brentwood.

24

of the old company; or (2) The formation of the new company was entered into to defraud the creditors of the old company; or (3) The circumstances attending the creation of the new company and its succession to the business and property of the old company are such that the new company was merely a continuation of the old company."  The court further instructed the jury to consider the following eight factors in determining whether a new company is a mere continuation of an older company:

> (1)  retention of the same employees;
> (2)  retention of the same supervisory personnel;
> (3)  retention of the same production facility in the same physical location;
> (4)  production of the same product;
> (5)  retention of the same name;
> (6)  continuity of assets;
> (7)  continuity of general business operations; and
> (8)  whether the successor holds itself out as the continuation of the previous enterprise.

The jury concluded that Brentwood succeeded to NLRHP, but not ORH.  Defendants challenged this conclusion in their Rule 50(b) motion, and they renew their arguments here.

Defendants first maintain that, as a matter of law, successor liability cannot be found in the absence of fraud, and that plaintiffs did not allege fraud.  Under Louisiana law:

> [A] newly organized corporation is liable for the debts of an old one . . . where it is shown that the succession was the result of a transaction entered into in fraud of the creditors of the old corporation, or that the circumstances attending the creation of the new . . . were of such a character as to warrant the finding that the new, is merely a continuation of the old, corporation.

Wolff v. Shreveport Gas, Elec. Light & Power Co., 70 So. 789, 794

25

(La. 1916)(emphasis added); see also Industrial Equip. Sales &
Serv. Co. v. Sec. Plumbing Inc., 666 So.2d 1165, 1166-67 (La. Ct.
App. 1995) (stating same); Russell v. Sunamerica Secs., Inc., 962
F.2d 1169, 1175-76 (5th Cir. 1992) ("[w]hen the successor may be
considered a 'mere continuation' of the predecessor," corporation
which acquires assets of another may be obligated for the
liabilities of corporation from which assets were acquired).

The clear language of Wolff establishes that defendants are
incorrect that fraud is a necessary component of successor
liability and establishes that the district court set out the
proper legal standard for the jury.  Furthermore, defendants
failed to object to the jury instructions on the ground that
fraud is a necessary component of successor liability.
Defendants therefore waived this argument.[14]

Defendants also challenge the sufficiency of the evidence
that Brentwood succeeded to NLRHP.  The eight factors included in
the jury instructions are the same as those we listed in Russell.
962 F.2d at 1176 n.2.  Although defendants insist that there is
insubstantial evidence to find that Brentwood succeeded to NLRHP,
we must uphold the jury verdict unless there is "no legally

---

[14]     Defendants maintain that there can be no successor
liability in the absence of a written agreement, pursuant to La.
Civ. Code Ann. art. 1821 (West 2000).  Defendants do recognize,
however, that Wolff represents an exception to this rule.
Defendants' failure to object to the jury instructions on the
successor liability theory also precludes assertion of this
argument on appeal.

26

sufficient evidentiary basis for a reasonable jury to find" as the jury did. Hiltgen, 47 F.3d at 699.

Most of the employees who were still employed at NLRHP become employees for Brentwood and some of the same supervisory personnel were retained by Brentwood. Brentwood also operated in the same physical location as NLRHP and retained the same phone number. Although defendants insist that Brentwood served a different patient population and provided different medical services, both Brentwood and NLRHP treated psychiatric and substance abuse disorders. These factors being among those which lead to successor liability, there is a legally sufficient evidentiary basis for a reasonable jury to conclude that Brentwood succeeded to NLRHP.

Accordingly, we affirm the jury findings in their entirety.

**III. Attorneys' fees**

Plaintiffs moved for attorney's fees, and the district court referred this motion to a magistrate judge. The magistrate judge calculated the lodestar, calculating the number of hours reasonably expended on the litigation by a reasonable hourly billing rate. The magistrate judge also noted the twelve factors set forth in Johnson v. Georgia Highway Express, Inc., 488 F.2d 714, 717-19 (5th Cir. 1974) pursuant to which the district court may adjust the lodestar upward or downward. The magistrate recommended awarding $300,703.10 for attorneys fees (including

27

legal research costs) and $5,289.51 in expenses, for a total award of $305,992.61. The district court adopted the magistrate's report and recommendation in its entirety. We review the district court's factual findings for clear error, and the district court's award of attorneys' fees for abuse of discretion. Riley v. City of Jackson, 99 F.3d 757, 759 (5th Cir. 1996).

Section 2104(a)(6) of WARN provides: "the court, in its discretion, may allow the prevailing party a reasonable attorney's fee as part of the costs." 29 U.S.C. § 2104(a)(6).[15] Defendants claim that plaintiffs are not "prevailing parties" in this litigation. Plaintiffs can be considered "prevailing parties" if they "succeed[ed] on any significant issue in litigation which achieves some of the benefits [plaintiffs] sought in bringing suit." Hensley v. Eckerhart, 461 U.S. 424, 433 (1983) (quotation omitted). Defendants are simply mistaken that all of plaintiffs' WARN Act claims failed at summary judgment. Plaintiffs did lose their mass-layoff claim, but were successful on the plant-closing claim. The court found that ORH was a WARN Act employer and that a plant closing had occurred. At trial, plaintiffs won on all of their veil-piercing and alter

---

[15] This provision is modeled on the attorney's fees provision of the Civil Rights Act. See S. Rep. No. 100-62, at 24 (1987) ("standards for determining an entitlement to fees, and the method of calculating the amount of the fees, are to be those already established pursuant to the Civil Rights Attorneys Fees Awards Act of 1978, 42 U.S.C. sec. 1988").

28

ego claims. The district court therefore properly concluded that plaintiffs were the prevailing parties in this litigation.

Defendants also contest the attorney's fees award as excessive, claiming that the attorney's fees exceed the damages award. Defendants mischaracterize the award. The district court entered judgment on the damages award for $334,046.28 plus prejudgment interest, and granted attorney's fees for $305,992.61. Moreover, we have previously declined to adopt a rule of proportionality between damages and attorney's fees. See Cobb v. Miller, 818 F.2d 1227, 1235 (5th Cir. 1987). Interpreting the Supreme Court's plurality opinion in City of Riverside v. Rivera, 477 U.S. 561 (1986), we found that while a low damages award is one factor which a district court may consider in setting the amount of attorney's fees, this factor alone should not lead the district court to reduce a fee award. Cobb, 818 F.2d at 1235.

Defendants argue that plaintiffs should not be entitled to any fees pursuant to WARN because of the failure of one of the federal claims. Defendants rely on McDonald v. Doe, 748 F.2d 1055 (5th Cir. 1984) for this proposition. In McDonald, we found that a plaintiff who only prevailed on pendent state law claims was not entitled to attorney's fees pursuant to 42 U.S.C. § 1988. 748 F.2d at 1057. In this case, plaintiffs did succeed on a federal claim and plaintiffs' state law claims were not separate from the federal claim. They were the mechanism for recovery on

29

the federal claim on which plaintiff succeeded.[16]  The district court did not abuse its discretion in finding the state law claims sufficiently related to the federal claim for purposes of awarding attorney's fees.

Defendants also claim that plaintiffs' counsel failed to exercise reasonable billing judgment.  The magistrate's report and recommendation reflects that the court carefully considered plaintiffs' counsel's billing records, and notes that counsel eliminated duplicative charges and fees relating to the unsuccessful mass layoff claim.[17]  The district court has "broad discretion in determining the amount of a fee award."  Associated Builders & Contractors of Louisiana, Inc. v. Orleans Parish Sch. Bd., 919 F.2d 374, 379 (5th Cir. 1990).  In light of the detailed records submitted by plaintiffs' counsel, and the careful review by the magistrate judge of all the time entries, we find defendants' argument that the billing records reflect noncompensable time or duplicative charges unavailing.

Defendants further question plaintiffs' counsel's billing

_____

[16]  Defendants' argument that the veil piercing claims had nothing to do with the WARN Act claim is disingenuous.  The district court found ORH liable under WARN and because of ORH's dissolution, the only way for plaintiffs to recover damages was to pursue the veil piercing claim under state law.

[17]  Defendants assert that plaintiffs' counsel failed to explain the reductions made as an exercise of billing judgment. On the contrary, plaintiffs' counsel did explain the reductions in the initial request for fees and in response to defendants' objections, made further reductions in fees which could have been related to the unsuccessful mass-layoff claim.

30

judgment by asserting that counsel "lumped" the time entries, grouping tasks performed into a single bill, thereby preventing the court from evaluating the reasonableness of the bill.[18] Defendants do not cite to specific entries, but rather allege that all of the time entries are lumped together. The district court, however, found the contemporaneous billing records specific enough to determine that the hours claimed were reasonable for the work performed. Defendants' blanket allegation that the entries are unreasonable does not persuade us that the district court abused its discretion. See Wegner v. Standard Ins. Co., 129 F.3d 814, 823 (5th Cir. 1997) (where defendant failed to provide court with detailed information on how total number of hours claimed in attorneys fees were unreasonable, "the district court's familiarity with the legal work done on this . . . case as well as our deferential standard of review . . . [constrained court] to hold that the district

---

[18] Defendants rely on several bankruptcy court opinions for the proposition that fees may not be awarded for "lumped" time entries. See, e.g. In re NRG Resources, Inc., 64 B.R. 643, 654 (W.D. La. 1986) (stating that counsel "should not group all tasks performed in one day into a single billing, and each type of service should be listed with the corresponding specific time allotment"). While counsel should always exercise billing judgment, we do not find NRG's statements, made in the bankruptcy context, applicable in granting fees under a statutory fee-shifting provisions such as WARN. Indeed, even a failure to provide contemporaneous billing statements "does not preclude an award of fees per se, as long as the evidence produced is adequate to determine reasonable hours." Louisiana Power & Light Co. v. Kellstrom, 50 F.3d 319, 325 (5th Cir. 1995). The evidence produced by plaintiffs' counsel here was certainly adequate for the district court to determine reasonable hours.

31

court had sufficient information before it to determine reasonable hours").

We conclude that the district court did not abuse its discretion in granting plaintiffs' request for attorney's fees, and affirm the award of $305,992.61.

## Conclusion

We affirm the district court's grant of summary judgment in favor of plaintiffs on the WARN Act claim. We also uphold the jury verdict in its entirety and affirm the grant of attorney's fees.

AFFIRMED.