**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

No. 97-30889

JOHN HUARD,

Plaintiff-Appellant,

VERSUS

SHREVEPORT PIRATES, INC. and BERNARD GLIEBERMAN,

Defendants-Appellees,

AND

J.I. ALBRECHT

Plaintiff-Appellant,

VERSUS

SHREVEPORT PIRATES, INC. and BERNARD GLIEBERMAN

Defendants-Appellees..

Appeals from the United States District Court
For the Western District of Louisiana

July 20, 1998

Before HIGGINBOTHAM, PARKER, and DENNIS, Circuit Judges.

DENNIS, Circuit Judge.

Plaintiffs-appellants, John Huard and J.I. Albrecht, appeal the judgment of the district court refusing to impose personal liability on Bernard Glieberman for the obligations of his solely-owned corporation, Shreveport Pirates, Inc., under the theory of "piercing the corporate veil." The district court concluded that the corporate veil should not be pierced because the evidence of fraud and/or disregard of the corporate entity by Glieberman was insufficient. Because we find no clear error in the district court's determinations, we affirm.

I.

Defendant-Appellee Bernard Glieberman (Glieberman) is a Michigan businessman engaged primarily in the construction of homes and the development of subdivisions. Glieberman's involvement in professional football began with his purchase of the Ottawa Rough Riders, Inc., a Canadian Football League (CFL) team, located in Ottawa, Canada. His son, Lonie Glieberman (Lonie), was the president of that corporation. After the Ottawa Rough Riders lost between four and five million dollars in two seasons, Glieberman sold the assets of the team and undertook efforts to begin a CFL team within the United States.

Glieberman retained a consultant to perform revenue projections for a CFL team in Shreveport, Louisiana. The initial projections estimated that the first year's revenue would be approximately $6 million whereas expenses would be $5.4 million resulting

2

in a profit of $600,000. Based on these projections, Glieberman incorporated the Shreveport Pirates, Incorporated (Pirates) on February 11, 1994. At the first shareholders' meeting, Glieberman, the sole shareholder, was elected chairman of the board of directors; Lonie was also elected to the board. The board chose Glieberman to serve as secretary-treasurer and Lonie as president.

After paying $362,000 to the CFL to have the CFL franchise transferred from Ottawa to Shreveport, Glieberman began to assemble a staff for the Pirates. The Pirates hired J.I. Albrecht (Albrecht) to serve as Executive Vice President-Football Operations for the 1994-96 seasons on February 18, 1994. Albrecht had been employed as a consultant to the Ottawa Rough Riders football club and had extensive experience in the management of football teams and organizations in the CFL and other leagues. On February 24, 1994, the Pirates hired John Huard (Huard) as head coach for the 1994-96 seasons based on Albrecht's recommendation. Prior to accepting a job with the Pirates, Huard held a coaching position in Maine and had extensive experience as a football coach in the CFL and elsewhere. Both men were promised a salary and other benefits under their contracts.

By April 1994, pre-season ticket sales had generated approximately $500,000. Although the proceeds from these sales exceeded the amount of money needed to fund early pre-season operations, Glieberman testified that they were much lower than originally expected. Seeking to utilize this early revenue as effectively as possible, Glieberman persuaded Lonie to loan the money to Glieberman's other corporations at an interest rate comparable to that paid by banks. Pursuant to this agreement, a

3

$400,000 check was issued to Glieberman to allow him to allocate this money among his other corporations in need of additional funding. This money was repaid to the Pirates in various increments with interest during the summer of 1994.

Unfortunately for the Pirates, the team's revenues never came close to the pre-season projections. By the end of the Pirates' first year of operations, the Pirates' income statement showed losses of $3.4 million. During the year ending December 31, 1995, the Pirates' second year of operation, the corporation lost in excess of $2.5 million. Hoping the team would eventually obtain financial success, Glieberman provided weekly loans to the corporation to allow it to continue operations. Over the course of the team's two years in operation, Glieberman loaned over $5 million, interest-free, to the corporation. During this time, neither Lonie nor Glieberman received any salary or dividends from the corporation.

Due to the significant losses incurred by the Pirates in 1994, Glieberman approached the City of Shreveport in hopes of obtaining financial assistance for the Pirates. After various negotiations, a "Cooperative Endeavor Agreement" was made wherein the City agreed to provide the team with funding sufficient to cover fifty percent of the team's losses in 1995 up to $1 million. Although the money provided by the City of Shreveport was obviously intended to provide assistance to the football team, the actual parties to the Cooperative Endeavor Agreement were the City of Shreveport and a new Glieberman corporation, Shreveport Canadian Football, Incorporated (SCFI). The Gliebermans and the City decided to have the funding handled in this manner because the City of Shreveport wanted its funding to continue 1995 operations rather

4

than pay 1994 creditors. Although it appears from the record that the possibility of transferring the team's operations from Shreveport Pirates, Inc., to the new corporation, Shreveport Canadian Football, Inc., was at one time considered, no transfer ever occurred. Furthermore, the checks from the City of Shreveport actually were deposited into the Pirates' bank accounts.

Despite the City of Shreveport's attempt to resuscitate the Pirates, the CFL voted to terminate operations in the United States in 1995 after the two years of multi-million dollar losses incurred by the Pirates and the failure of other Canadian Football League teams in the United States. As such, the Shreveport Pirates did not operate after 1995 though the corporation itself has not been dissolved.

On June 16, 1994, during the 1994 spring practice, the Pirates terminated Huard and hired Forrest Gregg as the head coach. Glieberman informed Huard that he would not receive any more money under his employment contract on July 16, 1994, despite Huard's assertion that the contract entitled him to continued payment of his salary for the three year term of his contract notwithstanding his termination. A f t e r settlement attempts failed, Huard filed suit against the Pirates on July 19, 1994. He alleged breach of contract, intentional interference with contract, and fraud. He filed a motion for partial summary judgment on September 30, 1994; the district court granted it on November 3, 1994. The summary judgment indicated that Huard was entitled to continue receiving his salary, but not his benefits, under the employment contract. On December 14, 1994, the court denied Huard's motion to amend its order granting summary judgment to award a money judgment in the amount of $258,333.36--the total

5

salary to be paid Huard under his contract.

After Albrecht was terminated in July 1994, he filed suit against the Pirates and Glieberman in September 1995. Because Huard had amended his complaint to add Glieberman as an additional defendant in April 1995, the two cases were consolidated for trial with respect to the issue of whether Glieberman should be held personally liable for the obligations owed pursuant to the contracts between the Pirates, a corporation, and the plaintiffs. After a bench trial, the district court concluded that the doctrine of piercing the corporate veil should not be applied so as to impose personal liability on Glieberman. This appeal followed.

II.

The question of whether to pierce the corporate veil is primarily one of fact. LeBlanc v. Opt, Inc., 421 So.2d 984, 989 (La. Ct. App. 3d Cir. 1982), writ denied, 427 So.2d 438, 429 So.2d 132 (La. 1983). As such, we review the district court's determination only to ensure that it is not clearly erroneous. FED. R. CIV. P. 52(a); Villar v. Crowley Maritime Corp., 990 F.2d 1489, 1497 (5th Cir. 1993), cert. denied, 510 U.S. 1044 (1994).

III.

Under Louisiana law, "corporations are distinct legal entities, separate from the individuals who comprise them." Riggins v. Dixie Shoring Co., Inc., 590 So.2d 1164, 1167 (La. 1991); see also LSA-R.S. 12:93(B). As such, shareholders are not liable for

6

the debts of the corporation as a general rule. Riggins, 590 So.2d at 1167. This rule of limited liability has long been justified by the theory that it encourages business and industry, including investment in high-risk ventures, as investors can make capital contributions to corporations without endangering their personal wealth. Id. at 1167-68. Because of the benefits associated with use of the corporate form, disregard of the limited liability associated with corporate ownership under the theory of veil piercing is "a drastic remedy and must . . . be construed very narrowly and exercised reluctantly and cautiously." Riggins, 592 So.2d at 1283 (concurrence in denial of rehearing). See also Riggins, 590 So.2d at 1168 (corporate veil should be disregarded only in exceptional circumstances).

The Louisiana courts have indicated that the corporate veil should be pierced when adherence to the corporate fiction would clearly result in inequity. See Watson v. Big T Timber Co., Inc., 382 So.2d 258, 262 (La. Ct. App. 3d Cir. 1980); Giufria Realty Co., Inc. v. Kathman-Landry, Inc., 173 So.2d 329, 334 (La. Ct. App. 4th Cir. 1965). The ultimate inquiry, however, requires a balance of the policies behind the recognition of a separate corporate existence with the policies justifying piercing. Glazer v. Comm'n on Ethics for Public Employees, 431 So.2d 752, 757 (La. 1983). This balance is less likely to tip in favor of disregarding the corporate veil when the underlying claim is based on contract. Riggins, 592 So.2d at 1285 (concurrence in denial of rehearing); see also Abraham v. Lake Forest, Inc., 377 So.2d 465, 469 (La. Ct. App. 4th Cir. 1979), writ denied, 380 So.2d 99, 100 (La. 1980); Morris, "Piercing the Corporate Veil in Louisiana," 52 La. L. Rev. 271 (1991). More stringent standards are justified with

7

respect to contract claims because the plaintiff's claim depends on the existence of a contract in which he chose to rely solely on the obligation of the corporation without any additional guarantees from its shareholders. Riggins, 592 So.2d at 1285 (concurrence in denial of rehearing); Morris, supra, at 290-92. As such, a plaintiff urging a court to pierce the veil under such circumstances faces an additional hurdle to this already difficult task. As the Supreme Court of Louisiana in Riggins explained:

> [g]enerally [this] is done where the corporation is found to be simply the "alter ego" of the shareholder. It usually involves situations where fraud or deceit has been practiced by the shareholder acting through the corporation. Another basis for piercing the corporate veil is when the shareholders disregard the requisite corporate formalities to the extent that the corporation ceases to be distinguishable from its shareholders.

Riggins, 590 So.2d at 1168 (internal citations omitted). When shareholders disregard the corporate form or use it to perpetuate fraud, the privilege of limited liability is waived. Glazer, 431 So.2d at 757.

In determining whether to apply the alter ego doctrine, the totality of the circumstances must be considered; however, the following factors are usually considered relevant in evaluating adherence to corporate formalities: (1) commingling of corporate and shareholder funds; (2) failure to follow statutory formalities for incorporating and transacting corporate affairs; (3) undercapitalization; (4) failure to provide separate bank accounts and bookkeeping records; and (5) failure to hold regular shareholder and director meetings. Riggins, 590 So.2d at 1168. Although the jurisprudence indicates that the corporate veil may be pierced without the presence of fraud, "Louisiana courts are reluctant to hold a shareholder, officer, or director of a

8

corporation personally liable for corporate obligations, in the absence of fraud, malfeasance, or criminal wrongdoing." Id. When fraud has not been alleged, a plaintiff seeking to pierce the corporate veil bears a heavy burden of proof in demonstrating that the corporate form has been disregarded by the shareholders to the extent that the corporation and shareholders are indistinguishable. Id.

In arguing that Glieberman's actions on behalf of the Pirates constituted fraud, the plaintiffs primarily assert that all of Glieberman's dealings with respect to the Pirates viewed in toto indicate fraud or deceit.[1] In other words, Huard and Albrecht assert Glieberman structured the Pirates in such a way so as to allow him to choose which of the Pirates' creditors would be paid. In so arguing, the plaintiffs point to Glieberman's withdrawal of $400,000 of the Pirates' preseason ticket revenue, the security interest that the Pirates granted Glieberman in its assets on September 30, 1994, and the events surrounding the 1995 Cooperative Endeavor Agreement made with the City of Shreveport.

After three days of testimony, the district court determined that there was insufficient evidence of fraud.[2] The district court explained that it could not conclude

---

[1] The Louisiana Civil Code defines fraud as "a misrepresentation or a suppression of the truth made with the intention either to obtain an unjust advantage for one party or to cause a loss or inconvenience to the other. Fraud may also result from silence or inaction." LA. CIV. CODE art. 1953.

[2] Although the district court's minute entry in favor of Glieberman refers to oral reasons given at trial, the district court's memorandum ruling and order of November 22, 1996, denying the plaintiffs' motions for a new trial and to amend the judgment or the court's findings provide additional insight with respect to the district court's earlier conclusion.

9

that Glieberman's dealings with the Pirates had resulted in a true advantage to him or detriment to the plaintiffs. In support of this conclusion, the court emphasized that Glieberman had continued to place his own money at risk by making large weekly deposits into the corporation's accounts. In addition, the money received from the City of Shreveport pursuant to the Cooperative Endeavor Agreement was ultimately deposited into the Pirates' accounts and thus made accessible to the Pirates' creditors.

The court found the deposit of the City's money into the Pirates' accounts to be especially relevant when considered in light of Glieberman's obvious awareness of the plaintiffs' claims against the team and of the summary judgment entered in favor of Huard. If Glieberman had wanted to hide any of the City's money from the plaintiffs, the court reasoned, he would have placed it in a separate SCFI bank account rather than the Pirates' accounts. Furthermore, the funds received by the Pirates both from Glieberman himself and the City during this time period were used exclusively to pay the Pirates' other creditors; neither of the Gliebermans received a salary or other dividend. Finally, the court reasoned that the Gliebermans could have caused the corporation to declare bankruptcy to the detriment of all the Pirates' creditors and the City of Shreveport; instead, they chose to continue their efforts to make the team a successful venture.

The district court was not persuaded by the plaintiffs' arguments that they did not know that the money from the City of Shreveport actually had been deposited into the Pirates' account as SCFI, not the Pirates, was a party to the Cooperative Endeavor Agreement. The court reasoned that it was common knowledge that the City was

10

providing funds to the football team regardless of which corporate entity was made a party to the Cooperative Endeavor Agreement. Given this knowledge, the court concluded, the plaintiffs should have used available legal remedies to ascertain the extent of the Pirates' assets and/or attach the Pirates' bank accounts. The court further deemed the plaintiffs' argument that Glieberman would not have deposited any money into the Pirates' account if they had attached it to be pure speculation. We cannot say that the district court clearly erred in concluding that the plaintiffs did not provide sufficient evidence of fraud. Further, we cannot say that a Louisiana state court would have reached a contrary conclusion. Although it is unfortunate that the Pirates did not continue paying the plaintiffs' salaries after their terminations, this does not automatically render Glieberman personally liable to the plaintiffs. The record does not reveal any clear indication that Glieberman intended to defraud the plaintiffs at the time that they were hired. In fact, the employment contracts as well as other portions of the record imply that Glieberman fully expected the team to be a successful venture with the plaintiffs receiving corresponding financial rewards.

The circumstances alleged by the plaintiffs subsequent to their hiring also do not demonstrate that Glieberman's motives changed to an extent that it would be an injustice for Glieberman to avoid personal liability on the plaintiffs' employment contracts. Cf. Lopez v. TDI Services, Inc., 631 So.2d 679, 686-87 (La. Ct. App. 3d Cir.), writ denied, 637 So.2d 501 (La. 1994) (six different companies were incorporated in order to escape liabilities and creditors of predecessor; assets were stripped from old corporations and transferred to new corporations in an attempt to evade old

11

corporations' creditors); George A. Hormel & Co. v. Ford, 486 So.2d 927, 929 (La. Ct. App. 1st Cir. 1986) (depletion of corporate account with specific purpose of avoiding payment of check issued to plaintiff); Watson, 382 So.2d at 262 (withholding material information in negotiating timber sale amounted to an attempt to defraud).

First, the $400,000 dollars withdrawn from the Pirates' account and loaned to other Glieberman corporations was repaid in full with interest. Second, Glieberman placed $5-6 million of his own money at risk by depositing it into the Pirates' accounts and using it to maintain operations. The fact that this money was categorized as "loans" in the Pirates' books rather than capital investment does not change the fact that Glieberman risked losing his money by making it available to the Pirates. Finally, regardless of the identity of the parties to the Cooperative Endeavor Agreement, Glieberman did not attempt to shield the money from the Pirates' creditors; in fact, the money was deposited into the Pirates' accounts and used to maintain the team's operations for a second season.

The plaintiffs further argue that the district court erred in considering the import of the deposit of the money provided by the City into the Pirates' account in light of Glieberman's awareness of Huard's judgment against the corporation as these events occurred after the accrual of the plaintiffs' causes of action. Presumably, the plaintiffs would have the court limit its consideration to events occurring no later than July 26, 1994, the date that Albrecht was fired. Assuming arguendo that the plaintiffs are correct, Glieberman's only relevant conduct would be the $400,000 withdrawal from the Pirates' account and the weekly transfers of funds to finance the Pirates' operations.

12

As we have concluded that the district court did not err in finding insufficient evidence of fraud given its consideration of Glieberman's conduct throughout the 1995 football season, we certainly do not think limiting judicial inquiry to this shortened period of time requires a contrary result. If anything, restricting our focus to these events only provides support for the district court's conclusion. Although reasonable minds may differ as to the wisdom of withdrawing money from the Pirates' accounts for outside investment and relying on shareholder financing, we find no clear error in the district court's finding that such actions were not fraudulent.

Huard and Albrecht also argue that the second basis for veil piercing--disregard of corporate formalities to the extent that the corporation becomes indistinguishable from the shareholder-- is satisfied by the facts of this case.[3] As we have explained, factors usually considered by Louisiana courts in determining whether to pierce the veil include: (1) commingling of corporate and shareholder funds; (2) failure to follow

---

[3] We note that one commentator, Professor Glenn Morris of the Paul M. Hebert Law Center at Louisiana State University, has argued that Louisiana courts realize that in reality solely-owned corporations are almost always operated as instrumentalities or alter egos of their owners. Morris, supra, at 280-81. See also Lopez, 631 So.2d at 685 ("Even if all the 'corporate formalities' are followed, they will not separate the personality of the corporation from complete dominance by the principal shareholder."). In support of this assertion, Professor Morris explains that the Louisiana jurisprudence has not "imposed personal liability on a corporate shareholder strictly on 'alter ego or instrumentality' grounds, where some form of misrepresentation, financial impropriety or inequity was not also present." Morris, supra, at 280-81. See, e.g., LeBlanc, 421 So.2d at 989 (veil piercing required to prevent injustice when representations and dealings of the sole shareholder "almost amount[ed] to an attempt to defraud"). The plaintiffs in the instant case do not appear to disagree; in fact, they themselves argue that a showing of inequity resulting from the disregard of the corporate formalities is required to prevent shareholders who are "merely lax, casual, or sloppy, from being penalized."

statutory formalities; (3) undercapitilization; (4) failure to provide separate bank accounts and bookkeeping records; and (5) failure to hold regular shareholder and director meetings. The plaintiffs assert that consideration of these factors in light of the facts of the instant case requires that the corporate veil be pierced. The district court disagreed; it concluded that the corporation had not become indistinguishable from the shareholder.

The plaintiffs argue that the corporate formalities were not followed in the instant case as (1) commingling occurred; (2) only "four pieces of paper were generated" during the entire two years of the corporation's existence and three of them, officer's certificates, were false; (3) the Pirates had no capital; (4) no shareholder or director meetings were held after incorporation. In asserting that the corporation was undercapitalized, the plaintiffs assert that the past services rendered by Glieberman as payment for Pirates' stock were not valued as they should have been. Furthermore, they assert that the franchise transfer fee paid by Glieberman, in addition to his weekly transfer of funds to the corporation, were characterized as debts owed to Glieberman rather than capital contributions. Gleiberman asserts that an accounting error occurred with respect to the classification of the transfer fee; he maintains that he intended it to be a capital contribution. With respect to commingling, the plaintiffs advert to the frequent transfers of funds between Glieberman and his other corporations and the Pirates, the withdrawal of $400,000 from the Pirates' accounts for investment in other Glieberman corporations, and the money provided by the City of Shreveport to SCFI but deposited into the Pirates' bank accounts.

14

In the instant case, each side can point to facts favoring its position. Having said this, we conclude that the district court was not clearly erroneous in finding that the corporate entity had not become indistinguishable from the shareholder. Cf. McDonough Marine Service v. Doucet, 694 So.2d 305, 310-11 (La. Ct. App. 1st Cir. 1996) (corporations and shareholders not indistinguishable despite transfers of assets from one corporation to another and intentional undercapitalization when corporations complied with all essential corporate formalities, had separate bank accounts, conducted informal board meetings, contracted and conducted business in name of the corporation, and plaintiff's representatives knew they were dealing with corporations); Kingsman Enterprises, Inc. v. Bakerfield Electric Co. Inc., 339 So.2d 1280, 1283-84 (La. Ct. App. 1st Cir. 1976) (veil piercing not appropriate in absence of allegations of fraud or deceit when plaintiff understood it was contracting with a corporation, separate bank accounts and bookkeeping records existed, and transactions between majority shareholder and corporation were sufficiently documented so as to maintain separate identity of the funds); Henry J. Mills Co., Inc. v. Crawfish Capitol Seafood, Inc., 569 So.2d 1108, 1111-12 (La. Ct. App. 3d Cir. 1990) (veil piercing not justified despite corporation's failure to issue stock certificates, keep minutes of shareholder meetings, write bylaws, and corporate financing being completely dependent upon bank loans; shareholder meetings were held and corporation had its own bank account); Hebert v. Wiegand, 207 So.2d 882, 887 (La. Ct. App. 4th Cir. 1968) (veil piercing appropriate despite absence of fraudulent intent when majority shareholder was uncertain as to whom the corporate officers were, no corporate records, by-laws, or separate corporate

15

bank account existed, there were no regular meetings of the directors or shareholders, and corporate funds were commingled with personal funds).

First, Huard and Albrecht do not dispute that the Pirates had bookkeeping records and bank accounts separate from Glieberman personally and his other corporations. In addition, though we acknowledge that the plaintiffs have raised some doubts as to whether Glieberman actually made capital contributions, rather than loans, to the corporation, an argument can be made that he did notwithstanding the inadequate recordation of the contributions. Even if he did not, we do not find that this factor, when viewed in light of the totality of circumstances, requires the corporate veil to be pierced.

With respect to commingling, the plaintiffs argue that the frequent transfers of funds to and from Glieberman and his corporations qualify as commingling. A majority of the transfers in question, however, were loan transactions. In Riggins, the Supreme Court of Louisiana indicated that interest-free loans from shareholders to their corporations did not constitute sufficient grounds for disregarding the corporate form. 590 So.2d at 1171.

The Louisiana first circuit reached a similar conclusion in Kingsman, 339 So.2d at 1283. The Kingsman court explained that various transfers of funds between two corporations and between the shareholder and the two corporations did not constitute commingling when separate bank accounts were maintained by each corporation as well as the shareholder, different accountants were used, and corporate bookkeeping was kept completely separate. Id. The court further indicated that it was not unusual for a sole shareholder to loan money to his corporations and have the money repaid. The

16

court concluded, "[s]uch circumstances do not demonstrate a commingling of corporate funds with the funds of the individual, thereby destroying the separate identities of the entities." Id. See also Harris v. Best of America, Inc., 466 So.2d 1309, 1315-1316 (La. Ct. App. 1st Cir.), writ denied, 470 So.2d 121 (1985) (same); Liberto v. Villard, 386 So.2d 930, 936 (La. Ct. App. 3d Cir. 1980) (transfer of money from corporate accounts into shareholder's personal accounts not improper as transfer was reimbursement for personal funds spent on corporate obligations); but see Abraham, 377 So.2d at 468 (commingling had occurred in the sense that a subsidiary corporation received virtually all of its funds from a parent corporation and proceeds of a sale made by the subsidiary were deposited into the parent's account); LeBlanc, 421 So.2d at 989 (commingling occurred when shareholder frequently transferred funds between his corporations). As most of the funds transfers in the instant case were characterized as loans and clearly documented so as to maintain their identity and source, we do not find this factor to weigh in favor of piercing the corporate veil. Although some of the corporate formalities were not strictly followed in operating the Pirates, the Gliebermans ensured that the corporation was run on a corporate footing and that most of the essential corporate formalities were followed. It is clear that articles of incorporation were filed with the Louisiana Secretary of State, by-laws were adopted, initial meetings of the shareholders and directors were held, and stock was issued. Further, the Louisiana Secretary of State issued the Pirates a certificate of incorporation. The Gliebermans contracted in the name of the corporation, maintained separate corporate bank accounts, and filed an election for federal taxation as a "S" corporation. Although formal shareholder or

17

director meetings were not regularly held subsequent to incorporation, Glieberman and Lonie, both directors and officers of the corporation, conducted daily phone meetings. In addition, the two met several times during the year when Glieberman traveled to Shreveport for football games.

The Riggins court also addressed the failure to hold meetings of the board of directors or keep corporate minutes. The court explained that informal meetings about business operations between the primary shareholder of the corporation and his son, a corporate employee, "satisf[ied] the spirit of the requirement [of regular board meetings]". 590 So.2d 1164, 1169. Further, the court indicated that while the failure to keep corporate minutes might "indicate less than precise handling of corporate affairs, [it does] not thwart the basic requirement of maintaining a separate existence between the shareholders and the corporation when viewing the entire circumstances." Id. at 1171.

In any event, the factors that the plaintiffs can isolate favoring their position lose their significance when considered in light of the totality of the circumstances present in this case. The corporate obligations for which the plaintiffs seek to hold Glieberman personally liable are contractual obligations. As we have explained, the corporate veil should only be pierced with respect to contract claims when compelling equitable considerations favor this remedy; otherwise, courts are not to disturb the allocation of risks established by the parties.

The circumstances of this case do not compel piercing of the corporate veil. Although the plaintiffs may not be as well versed in the workings of corporations as

18

Glieberman, neither was a newcomer to the world of professional football organizations. Albrecht had extensive experience in management of football teams and organizations in the CFL and other leagues; in fact, he had worked previously as a consultant for Glieberman's prior team, the Ottawa Rough Riders. Huard had extensive experience as a football coach and professional player prior to being hired as head coach for the Pirates. In addition, Huard's contract was negotiated by Dean Albrecht, sports agent to numerous professional football players and coaches. Furthermore, both plaintiffs had to have realized that establishing a CFL football team in Shreveport, Louisiana, could only be characterized as a risky and uncertain venture. Albrecht, especially, was aware of the financial risks involved due to his prior association with the unprofitable Ottawa Rough Riders venture. As such, it does not require a stretch of the imagination to conclude Albrecht and Huard understood that the Pirates conceivably could become financially incapable of fulfilling the terms of their contracts. For the foregoing reasons, the judgment of the district court refusing to hold Bernard Glieberman personally liable for the obligations of Shreveport Pirates, Inc., under the theory of piercing the corporate veil is AFFIRMED.