**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

_____

No. 00-31391
_____

JO ANN WILLIAMS, ETC.,

                                                            Plaintiff,

                              versus

MIDWEST EMPLOYERS CASUALTY CO. and
on behalf of Willie E. Williams

              Defendant-Plaintiff-Third Party Plaintiff-Appellant,

                              versus


ADAMS PLASTICS, INC. AND SPARTECH CORPORATION,

                    Defendants-Third Party Defendants-Appellees.

_____

Appeal from the United States District Court
for the Western District of Louisiana
(97-CV-1208)
_____
March 21, 2002

Before KING, Chief Judge, and DAVIS, Circuit Judges and VANCE,[1]

District Judge.

PER CURIAM:[2]

    Appellant Midwest Employers Casualty Company appeals

multiple partial summary judgment rulings against it regarding

_____

    [1] District Judge of the Eastern District of Louisiana,
sitting by designation.

    [2] Pursuant to the 5th Cir. R. 47.5, the court has determined
that this opinion should not be published and is not precedent
except under the limited circumstances set forth in 5th Cir. R.
47.5.4.

excess insurance coverage for the workers' compensation claim of a former employee of its insured, Adams Plastics, Inc. Appellant sought to impose liability on Adams and its parent company, Spartech Corporation, under the theory of "piercing the corporate veil" for claims it brought as assignee of the employee and as a third-party plaintiff. The district court concluded that, as an assignee of Williams' workers' compensation claim, Midwest was entitled to recover from Adams up to the amount of Adams' self-insured retention and that there was no merit to any of Midwest's other claims. After our review of the voluminous record in this case, we conclude that the district court did not err when it granted summary judgment *sua sponte* against Midwest on the issues of the existence vel non of insurance coverage and on piercing the corporate veil. We further decide that the district court did not err when it determined that Williams' settlement with and release of Spartech foreclosed Midwest's claims against Spartech as Williams' assignee. Finally, we decide that the district court erred when it dismissed *sua sponte* Midwest's claims against Adams for breach of its contractual duties to defend and settle claims. Accordingly, we affirm in part and reverse and remand in part.

## I. Background

Adams Plastics, Inc. d/b/a Spartech Films, was incorporated in 1985 with 1000 shares of stock at par value of $1.00 per share

and $150,000 of paid-in capital.  Spartech Corporation owned all of the stock of Adams.  Adams engaged in the business of manufacturing and selling plastic film products at a plant that Adams owned in Monroe, Louisiana.  Adams' plant, land, and equipment had a value of over $1.4 million and a lease value of $150,000 per year.  The plant's local general manager directed day-to-day activities, and he was responsible for negotiating raw materials contracts and formulating the annual business plan. Adams' board of directors retained final approval power over the business plans.  Adams' board of directors had some overlapping members with Spartech's board, and the two companies shared some common business departments that operated out of St. Louis, Missouri.  They filed consolidated financial statements and federal tax returns with the Securities and Exchange Commission and the Internal Revenue Service, respectively.  Each company kept separate books, and Adams' board conducted business through unanimous consents, as permitted by Louisiana law.

In October 1991, Spartech closed Adams' Monroe plant because Adams had become a severe financial drain on Spartech.  Indeed, between 1989 and 1991, in an effort to keep Adams in business, Spartech "downstreamed" cash to Adams on a weekly basis, totaling over one million dollars per year.  After it closed Adams' plant, Spartech transferred the Adams plant and land to an inactive subsidiary and offset the value of the transferred property

3

against Adams' debt to Spartech.

In 1989, Charles Northern, an insurance broker, approached Adams and offered to help the company become a self-insurer for workers' compensation claims and to help it obtain excess workers' compensation coverage from Midwest.  Louisiana employers had the option of purchasing workers' compensation liability insurance or becoming a "qualified self-insurer," with an appropriate excess policy of workers' compensation insurance. Northern obtained financial information from Adams, including historical loss and payroll data, and he filled out Midwest's two-page insurance application that he had developed with Midwest.  Midwest did not ask Adams for any other information or documentation.  Midwest responded to Adams' application with a proposal for coverage, and Adams accepted the proposal.  Midwest issued the policy in May 1989.  The policy covered losses for workers' compensation claims for occupationally-caused disease if the employee's last exposure occurred during the term of the policy.

Under the policy, Adams represented that it was a duly qualified self-insurer under the workers' compensation laws of Louisiana.  At that time, to qualify as a self-insurer, an employer had to own real estate in Louisiana worth $25,000. Adams met this qualification at the time it applied for insurance with Midwest, and at the time Midwest issued the policy in May

4

1989.  In July 1989, however, Louisiana changed its laws and required a prospective self-insurer to get approval from the Louisiana Office of Workers' Compensation Administration ("OWCA") and to prove that it could pay a $150,000 per-claim deductible and post a $200,000 bond or cash with the State as security to pay claims if the self-insurer could not.  Northern applied to the State to obtain approval for Adams under the new workers' compensation scheme.  The OWCA tentatively approved Adams as a qualified self-insurer in August 1991.  Midwest renewed Adams' policy in 1990 and 1991.  In September 1991, the OWCA revoked Adams' self-insurer status because Adams was unable to provide the State with the necessary security.  Adams then terminated its excess policy with Midwest effective September 30, 1991.  Adams paid all premiums due during the term of the Midwest policy.

Willie Williams was employed by Adams at its plant in Monroe.  In October 1989, Williams complained that he was disabled as a result of lung problems caused by breathing in plastic at the Adams plant.  F.A. Associates handled Williams' claim as a third-party administrator on behalf of Adams.  Adams paid Williams weekly workers' compensation benefits totaling $23,760 until October 9, 1991, when Adams ceased doing business. Weeks before Adams shut-down its operations, F.A. Associates sent Adams and Midwest a letter summarizing Williams' case and the potential for "rather heavy exposure" it presented.  The letter

5

also indicated that Adams had stated an intention to shut its doors and "walk away" from any liabilities. F.A. Associates noted that it had an obligation to notify Williams' attorney of the lack of funds to pay his client's benefits.

In October 1991, Williams filed a claim in the OWCA against Adams and Spartech for continued benefits based on his allegations that he was permanently and totally disabled. Williams then settled all of his claims against Spartech for $7500. The settlement was approved by the workers' compensation court, and it included a release of all claims by Williams against Spartech. Williams reserved his rights against Adams. In July 1994, he obtained a default judgment against Adams declaring that he was permanently and totally disabled and entitled to benefits of $212.00 per week indefinitely. Adams was insolvent and failed to pay the judgment. In September 1994, Williams filed a supplementing and amending petition naming Midwest as an additional defendant seeking payment of the default judgment. The suit against Midwest was dismissed for lack of subject matter jurisdiction. In response, Midwest filed a declaratory judgment action in the United States District Court for the Western District of Louisiana to determine coverage under the policy. Before the district court entered its final ruling, Williams filed a motion against Adams to accelerate payment in workers' compensation court. Midwest received a notice of the

6

hearing on this motion.  Additionally, Adams notified Midwest that the motion had been filed and that it had no means to or intention of defending the claim.  Midwest did not defend the claim in workers' compensation court, and the court granted Williams' motion for acceleration of payments.  Ultimately, the federal district court issued a judgment declaring that Midwest was obliged to pay all workers' compensation benefits and medical expenses that Williams was entitled to receive that exceeded Adams' $150,000 self-insured retention under the Adams/Midwest policy.  Midwest sought to appeal the district court's ruling, but it missed both the deadline to file for a new trial and the deadline to file an appeal.  This Court dismissed its appeal as untimely.

In June 1997, Williams sued Midwest seeking $404,318.25 (the amount of the judgment against Adams in excess of $150,000) in Louisiana state court.  Midwest removed the action to federal district court.  On April 7, 1998, Midwest filed a third-party complaint against Adams and Spartech.  Midwest asserted tort and contract claims against Spartech and Adams, based on alleged breaches of contractual duties and improper conduct in connection with Williams' workers' compensation claim.  Midwest also asserted that Adams was not an independent corporation, but a "veil" for Spartech and part of a single corporate enterprise with Spartech.

7

In November 1999, Midwest settled Williams' claim for $267,500 and took an assignment of any claims Williams might have against Adams and Spartech. Midwest, in its capacity as Williams' assignee, then sought to undo the Spartech settlement and to assert claims against Spartech and Adams for all workers' compensation benefits to which Williams was entitled. Midwest further claimed that Spartech should be liable for Adams' obligations to Williams under the corporate veil doctrine.

On July 21, 2000, Midwest moved for partial summary judgment on the veil piercing issue. At a pretrial conference on August 18, 2000, the court ordered the parties to brief the issue of insurance coverage as it related to the declaratory judgment ruling and it informed the parties that it was considering Midwest's partial summary judgment on the veil piercing issue. On September 8, 2000, the district court *sua sponte* granted a partial summary judgment in favor of Spartech and Adams, the nonmoving parties on the corporate veil motion, based on the lengthy record before it. In a separate ruling also issued on September 8, 2000, the district court dismissed with prejudice Midwest's claims relating to the validity of the excess insurance contract based on the ruling in the declaratory judgment action and it dismissed Midwest's breach of contract claims. The court ruled that Midwest, in its capacity as Williams' assignee, was entitled to judgment against Adams in the amount of $126,240 plus

8

interest, which is the amount of Adams' self-insured retention ($150,000) minus the benefits that Adams actually paid to Williams ($23,760).  Finally, in a third ruling, the district court granted Adams' and Spartech's motion for partial summary judgment dismissing Midwest's claim that the settlement between Spartech and Williams was fraudulent, collusive, or otherwise unlawful or invalid.

On September 20, 2000, the district court entered a separate final judgment on its rulings.  Midwest moved for a new trial. The district court denied Midwest's motion for new trial on October 24, 2000, and Midwest timely filed its notice of appeal.

## II. Discussion

This court reviews a grant of summary judgment *de novo*, applying the same standard as the district court.  *See Harken Exploration Company v. Sphere Drake Insurance PLC,* 261 F.3d 466, 470 (5th Cir. 2001).  Summary judgment is proper only when there is not a genuine issue as to any material fact, and the movant is entitled to a judgment as a matter of law. *Id.*  We review the evidence in the light most favorable to the non-movant and make all reasonable inferences in its favor.  *Id.; Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587-88, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d. 538 (1986).  A fact is material if it might affect the outcome of the suit under governing law.  *Id.; Anderson v. Liberty Lobby, Inc.,* 477 U.S.

9

242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986). There is a genuine issue as to a material fact if the evidence is such that a reasonable jury could return a verdict for the non-movant. *Id.*

### A. Midwest's Claims as Subrogee of Williams

The Court finds no error in the district court's ruling that Williams released his claim against Spartech, and therefore had no claim to assign to Midwest. Midwest presented no evidence to indicate that any of Spartech's representations led Williams to agree to a settlement and release that he otherwise would not have made. *See* LA. CIV. CODE art. 1955 ("Error induced by fraud need not concern the cause of the obligation to vitiate consent, but it must concern a circumstance that has substantially influenced that consent."). Williams was represented by counsel in the workman's compensation proceeding who vigorously pursued his claim. Williams obviously knew there was a relationship between Adams and Spartech because he included Spartech as a defendant. Further, Williams' attorney could have ascertained the nature of the Adams/Spartech relationship without "difficulty, inconvenience, or special skill." LA. CIV. CODE art. 1954 ("Fraud does not vitiate consent when the party against whom the fraud was directed could have ascertained the truth without difficulty, inconvenience, or special skill."). Six years elapsed between the release and the assignment, and

10

Williams made no complaint about the release. Therefore, because Williams released any claims he might have had against Spartech, Midwest, as assignee of Williams' rights, has no claims against Spartech. Accordingly, Midwest cannot, as assignee, attach liability to Spartech through the piercing the corporate veil doctrine.

## B. Midwest's Claims in its Own Capacity

Midwest raises various issues on appeal regarding its claims as third-party plaintiff against Adams and Spartech.

### 1. Tort Claims

Midwest asserted tort claims based on alleged intentional and negligent misrepresentations regarding Adams qualified self-insured status. We find that Midwest's tort claims are prescribed. Although the district court did not rule on the issue of prescription, this Court may decide a case on any ground that was presented to the trial court. *Breaux v. Dilsalver,* 254 F.3d 533, 538 (5th Cir. 2001)(*citing Dandridge v. Williams,* 397 U.S. 471, 475 n. 6, 90 S. Ct. 1153, 1157 n. 6, 25 L. Ed. 491 (1970)); *see also Gregory v. Missouri Pacific Railroad Company,* 32 F.3d 160, 164 (5th Cir. 1994)(citing cases). Under Louisiana Civil Code article 3492, "[d]elictual actions are subject to a liberative prescriptive period of one year." LA. CIV. CODE art. 3492. When the plaintiff's complaint on its face reveals that prescription has run, the burden is on the plaintiff to show why

11

the claim has not prescribed. *Lima v. Schmidt,* 595 So.2d 624, 628 (La. 1992). Here, the face of Midwest's third-party complaint reveals that the one-year prescriptive period on Midwest's tort claims has run because it filed its third-party claims against Adams and Spartech in April 1998, and the claims relate to acts allegedly performed at the latest in 1991. Midwest contends that the prescriptive period was suspended under the principle of *contra non valentem*. Suspension of the prescriptive period under the *contra non valentem* principle occurs when "the cause of action is not known or reasonably knowable by the plaintiff, even though his ignorance is not induced by the defendant." *Corsey v. State Dept. of Corrections,* 375 So.2d 1319, 1322 (La. 1979). The Louisiana Supreme Court, however, noted that "this principle will not except the plaintiff's claim from the running of prescription if his ignorance is attributable to his own willfulness or neglect; that is, a plaintiff will be deemed to know what he could by reasonable diligence have learned." *Id.*

Clearly, Midwest was on inquiry notice of its claims in 1991 when Adams cancelled its insurance with Midwest because it could not maintain its self-insured status. Further, Midwest asserts that it was mislead as to the identity of its insured, but it is undisputed that when Adams returned the cancellation endorsement to Midwest in 1991, it changed the insured designation on the

12

form from "Spartech Films, A Division of Spartech, Inc." to "Spartech Films, A Division of Adams Plastics, Inc." Midwest could have discovered the factual basis of its claims through the exercise of reasonable diligence much earlier than a year before its suit was filed in 1998. *See Corsey,* 375 So.2d at 1322. Further, Midwest admitted it knew of the alleged misrepresentations when it filed its declaratory judgment action against Williams in May 1995. Midwest's complaint alleged that Adams misrepresented its qualified self-insured status when it applied for insurance coverage from Midwest. *See* Rec. Doc. 60, Ex. 11, Complt. at ¶ IX. Therefore, the one-year prescriptive period had run well before Midwest filed its third-party complaint against Adams and Spartech in April 1998 on claims involving misrepresentations about Adams' financial status. Accordingly, Midwest's tort claims are prescribed.

## 2. Contract Claims

The district court dismissed Midwest's claims regarding the existence of insurance coverage based on issue preclusion. The application of issue preclusion is a question of law that we review de novo. *United States v. Brackett,* 113 F.3d 1396, 1398 (5th Cir. 1997). Midwest contends that the district court improperly granted dismissal *sua sponte* on the coverage issue. In *Celotex Corp. v. Catrett,* the Supreme Court held that district courts "possess the power to enter summary judgments *sua sponte.*"

13

477 U.S. 317, 326, 106 S. Ct. 2548, 2554 (1986). The power to enter summary judgment *sua sponte*, however, is tempered by the requirement to provide proper notice. *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit,* 28 F.3d 1388, 1397 (5th Cir. 1994)(*citing Celotex,* 477 U.S. at 326, 106 S. Ct. at 2554); *Judwin Properties, Inc. v. United States Fire Ins. Co.,* 973 F.2d 432, 436-37 (5th Cir. 1992)("A district court may grant a motion for summary judgment *sua sponte*, provided that it give proper notice to the adverse party.")(citations omitted); *see also* Fed. R. Civ. Proc. 56(c) (requiring that summary judgment motion be served at least 10 days before the time fixed for the hearing). Failure to give notice may be harmless when the nonmovant has no additional evidence or if all the nonmovant's additional evidence is reviewed by the appellate court and none of the evidence presents a genuine issue of material fact." *Nowlin v. Resolution Trust Corp.*, 33 F.3d 498, 504 (5th Cir. 1994)(*quoting Leatherman*, 28 F.3d at 1398). This circuit also recognizes two instances in which the district or appellate court can *sua sponte* dismiss an action on issue preclusion grounds. *Nagle v. Lee,* 807 F.2d 435, 438 (5th Cir. 1987). One exception allows a court to raise the issue preclusion defense on its own when all the relevant data and legal records are before the court and the demands of comity, continuity in the law, and essential justice mandate judicial

14

invocation of the principles of issue preclusion. *See id.* at 439
n. 2 (*citing American Furniture Co. v. International
Accommodations Supply,* 721 F.2d 478, 482 (5th Cir. 1981)).

Here, Adams and Spartech specifically pleaded issue
preclusion as dictated by Federal Rule of Civil Procedure 8(c) in
their first amended answer to Midwest's third-party complaint
(*see* Rec. Doc. 212) and in their answer to Midwest's first
amended third-party complaint (*see* Rec. Doc. 339). *See* FED. R.
CIV. P. 8(c). Further, the court asked the parties for briefs on
the preclusive effect of the declaratory judgment ruling at the
August 18, 2000 pretrial conference, and in response, the parties
briefed the preclusion issue before the court ruled on it. *See*
Rec. Doc. 550, 567, 580. Moreover, all of the relevant data and
legal records, such as the declaratory judgment action pleadings
and rulings (*see* Rec. Doc. 60), were before the district court.
Therefore, essential justice mandated judicial invocation of the
principles of issue preclusion before the commencement of the
trial. *See Nagle,* 807 F.2d at 439.

Midwest contends that the district court erred by applying
issue preclusion to its coverage claims because the coverage
issues were not actually litigated in the previous action. We
find no error in the district court's application of the
principle of issue preclusion. The principle of issue preclusion
bars a party from relitigating issues of fact or law that were

15

necessary to the court's judgment and actually determined in a prior action. *Sidag Aktiengesellschaft v. Smoked Foods Products Co., Inc.,* 776 F.2d 1270, 1275 (5th Cir. 1985).

In Midwest's 1995 declaratory action against Williams, Midwest challenged Williams' right to collect workers' compensation benefits under the policy it issued to Adams. *See Midwest v. Williams,* Civil Action No. 95-CV-0798 (M.D. La. October 15, 1997), appeal denied, 161 F.3d 877 (5th Cir. 1998)(appeal denied based on untimely filing of notice of appeal). One of the issues Midwest asserted in its complaint was that Williams had no claim against it because the excess insurance policy it issued to Adams was void *ab initio* as a result of Adams' material misrepresentations that Adams was a qualified self-insurer. *See* Rec. Doc. 60; Ex. 11, Complt. at ¶ IX. In addition, Midwest asked for a declaration that Williams' employer was not an insured under the policy and that it had no coverage obligation because Williams settled his claim with Spartech. Midwest argued as it does here that since Spartech Films was listed on the policy endorsement as a division of Spartech, Inc., Spartech Films was Spartech. *See* Rec. Doc. 618, Ex. XII, Summ. J. Memo. at 8 n. 1. Midwest moved for summary judgment and the district court ultimately issued a ruling that Midwest was obliged to pay Williams' claim in excess of the $150,000 self-insured retention. Midwest raised the

16

fraud/misrepresentation issue in its pleadings on the motion. *See* Rec. Doc. 618, Ex. XII, Reply Memo. at 7. The court's ruling became final after Midwest's appeal was denied by the Fifth Circuit as untimely. *See* 161 F.3d at 880. The declaratory judgment found that Williams' employer, "Adams Plastics, Inc., d/b/a Spartech Films," was Midwest's insured and that it was obliged to pay workers' compensation benefits to Williams for injuries resulting from Williams' employment by Adams. *See Lamana v. LeBlanc,* 526 So.2d 1107, 1109 (La. 1988)(res judicata can be invoked to bar relitigation of issue presented in pleadings and addressed or referred to in judgment). The determination of the coverage issue was essential to the court's final judgment against Midwest because Midwest could not have been found to be liable to pay Williams unless the court determined that Adams was the insured and that the underlying excess policy between Adams and Midwest was valid. Accordingly, the district court did not err when it ruled that the issue of the identity of the insured and the validity of the policy were actually litigated and necessary to the judgment. Since the district court committed no error in finding that Spartech was not a party to the insurance contract, it properly dismissed Midwest's contract claims against Spartech.

Regarding Midwest's remaining contract claims against Adams, we find that the district court erred in dismissing *sua sponte*

17

Midwest's claims that Adams breached its duty to use diligence and good faith in the investigation, defense, and settlement of Williams' claim. The district court failed to provide the parties with notice that it planned to rule on the issue. *See Leatherman,* 28 F.3d at 1397-98; *Judwin Properties,* 973 F.2d at 436-37. At the pretrial conference the court asked the parties to brief the existence of any duties Spartech and Adams may have had under the contract, but it did not specifically ask for briefs on whether the duties were breached. *See* Rec. Doc. 550. Further, the parties' earlier summary judgment motions and their responses to the court's pretrial order merely addressed the issue of whether Spartech had a duty under the contract. Accordingly, the district court's ruling on Midwest's claim against Adams for breach of contractual duties to defend and settle claims is reversed and remanded.

### 3. Piercing the Corporate Veil

Midwest contends that the district court violated its due process rights by *sua sponte* granting summary judgment in favor of the nonmovants, Adams and Spartech, on the corporate identity issue without the proper notice. In *Exxon Corp. v. v. St. Paul Fire and Marine Insurance Co.,* 129 F.3d 781, 786 (5th Cir. 1997), this Court indicated that in order to achieve the goal of Federal Rule of Civil Procedure 56, the prompt disposition of cases when there is no genuine issue of material fact for the court to

18

consider, the district court may grant summary judgment for the nonmovant *sua sponte*.

Here, Midwest brought the partial summary judgment motion on the issue of corporate identity, so it had to have been on notice that the district court was considering the issue. *See Goldstein v. Fidelity and Guaranty Insurance Underwriters, Inc.*, 86 F.3d 749, 750 (7th Cir. 1996)(affirming grant of summary judgment in favor of nonmovant; after plaintiff filed for summary judgment both parties on notice that summary judgment being considered). Further, the court informed the parties at the August 18, 2000 pretrial conference that the court would consider Midwest's motion before the trial. *See* Rec. Doc. 550. Accordingly, we find that the district court did not violate Midwest's due process rights.

Corporations function as distinct legal entities, separate from the individuals who own them, and their shareholders are generally not liable for the debts of the corporation. *Riggins v. Dixie Shoring Co., Inc.*, 590 So.2d 1164, 1167 (La. 1991); *see also* LA. REV. STAT. § 12:93(B). Louisiana law holds that the limited liability afforded corporate ownership should be disregarded only in "*exceptional circumstances*." *Id.* at 1168 (emphasis added). Louisiana courts are reluctant to pierce the corporate veil in the absence of fraud, malfeasance, or criminal wrongdoing. *See id.* (piercing the veil is often justified to

19

prevent the use of the corporate form to defraud creditors).

Additionally, Louisiana courts are less likely to disregard the

corporate veil when the underlying claim is based on contract

rather than tort. *See Riggins v. Dixie Shoring Co., Inc.,* 592

So.2d 1282, 1285 (La. 1992)(concurrence in denial of

rehearing)(in contract cases plaintiff chooses to rely solely on

obligation of corporation without any additional guarantees from

its shareholders).

The Louisiana Supreme Court stated in *Riggins* that piercing

the corporate veil usually occurs when shareholders use the

corporate form to practice fraud or deceit or when the corporate

form is so ignored that the corporation has become

indistinguishable from its shareholders:

> There are limited exceptions to the rule of non-liability of
> shareholders for the debts of a corporation, where the court
> may ignore the corporate fiction and hold the individual
> shareholders liable. Generally that is done where the
> corporation is found to be simply the "alter ego" of the
> shareholder. It usually involves situations where fraud or
> deceit has been practiced by the shareholder acting through
> the corporation. (Citations omitted). Another basis for
> piercing the corporate veil is when the shareholders
> disregard the requisite corporate formalities to the extent
> that the corporation ceases to be distinguishable from the
> shareholders. (Citations omitted).
> 590 So.2d at 1167.

The totality of the circumstances is determinative when a party

seeks to pierce the corporate veil. *Id.* The *Riggins* court

listed several factors that courts consider when determining

whether to apply the alter ego doctrine:

20

(1) commingling of corporate and shareholder funds; (2) failure to follow statutory formalities for incorporating and transacting corporate affairs; (3) undercapitalization; (4) failure to provide separate bank accounts and bookkeeping records; and (5) failure to hold regular shareholder and director meetings.
*Id.* (citations omitted).

"The ultimate inquiry, however, requires a balance of the policies behind the recognition of a separate corporate existence with the policies justifying piercing." *Huard v. Shreveport Pirates, Inc.*, 147 F.3d 406, 409 (5th Cir. 1998)(*citing Glazer v. Commission on Ethics for Public Employees,* 431 So.2d 752, 757 (La. 1983)). As the Louisiana Supreme Court stated in *Glazer,* the same factual scenario may result in veil piercing in some contexts but not in others, depending on the competing interests and policies involved:

Depending on the various competing policies and interests involved, the same factual scenario may result in recognition of a separate corporate identity for some purposes, i.e. insulation of shareholders from liability, and a disallowance of the separate corporate entity privilege for others. Each situation must be considered by the court on its merits. The facts presented must demonstrate some misuse of the corporate privilege in that situation or the need of limiting it in order to do justice.
431 So.2d at 758 (citation omitted).

The Court finds that the district court committed no error in dismissing Midwest's veil piercing claim because there is no evidence that Spartech or Adams misused the corporate privilege to the detriment of Midwest or that Spartech and Adams are indistinguishable. Adams was properly formed with an initial

21

paid-in capital of $150,000.  Adams and Spartech maintained separate books, and Adams' day-to-day operations were handled by Adams' general manager in Monroe.  Adams' board of directors conducted business by unanimous consents, which is permitted by Louisiana law.  Further, that Adams' board of directors overlapped with Spartech's board and that it was located in St. Louis, where Spartech's corporate offices were located, do not present genuine issues of fact as to whether Spartech controlled Adams.  There is no evidence that anyone other than Adams' board members made decisions for Adams, such as approving the annual business plans formulated by Adams' general manager in Monroe.

Midwest argues that the corporate veil should be pierced because Adams and Spartech misused the corporate form in procuring insurance from Midwest so that Midwest issued its policy in ignorance of Adams' financial problems.  Midwest, is an excess insurer, however, which in no event would be liable for Adams' self-insured retention, regardless of Adams' financial condition.  Midwest's policy does not specify that the insolvency of the insured is a breach of contract or that it voids the policy.  Indeed, Midwest agreed that Adams' insolvency would not terminate the policy.  The Midwest policy provides:

> Bankruptcy or insolvency of the Insured will not relieve the Insurer of its duties and liabilities under this policy. After the Insured's retention has been reached, payments due under this policy will be made by the Insurer as if the Insured had not become bankrupt or insolvent, but not in excess of the Insurer's limit of indemnity.

22

> Appellant's Rec. Excerpts 13; Midwest Excess Ins.
> Policy at Part Seven(K).

Adams was obliged to pay premiums to Midwest for the coverage issued under the policy, and there is no evidence that Adams failed to pay its premiums before it terminated the policy.[3] Midwest issued the insurance policy to Adams as a qualified self-insured, which it was at the time the policy was issued in May 1989. Also, Adams' failure to maintain its qualification as a self-insurer did not increase Midwest's obligation under its contract because the policy provided that such an event would not result in Midwest's having to pay the self-insured retention. The policy states:

> If the Insured should terminate such qualifications or if qualification of the Insured as a self-insurer is cancelled or revoked while this policy is in force, the amounts payable under this policy will not exceed the amounts which would have been payable if such qualifications had been maintained in full force and effect.
> *Id.* at General Section E, "Qualified Self-Insurer."

The district court confirmed that Midwest had no obligation to pay the amount of Adams' self-insured retention to Williams. *See* Rec. Doc. 609, Memorandum Ruling at 6-7.

Further, because piercing the corporate veil is essentially an equitable remedy, the district court was correct to take into account Midwest's conduct with regard to Adams. *See Brown v.*

---

[3] Adams paid premiums totaling $21,869 for the May 1989 – May 1990 period and $27,022 for the May 1990 – May 1991 period. *See* Apellant's Rec. Excerpt 13.

23

*Benton Creosoting Co., Inc.,* 147 So.2d 89, 94 (La. Ct. App. 1962)(piercing the corporate veil especially appropriate when court is exercising equitable powers)(*quoting Mayo v. Pioneer Bank & Trust Company,* 274 F.2d 320, 321 (5th Cir. 1960)); *see also See Watson v. Big T Timber Co., Inc.,* 382 So.2d 258, 262 (La. Ct. App. 1980); *Giuffria Realty Co., Inc. v. Kathman-Landry, Inc.,* 173 So.2d 329, 334 (La. Ct. App. 1965)(corporate veil should be pierced when adherence to the corporate fiction would clearly result in inequity).  Midwest did no underwriting of its own and did not request financial information from Adams beyond the limited information Northern, the insurance broker, provided in the short-form application.  Moreover, Northern testified that financial information on the insured was generally not important to an excess insurer because its only liability was for amounts above the self-insured retention.

Further, the evidence in the record demonstrates that Midwest was notified of Williams' claim in September 1991.  A letter from Adams' third-party administrator, F.A. Associates, who had investigated the claim, indicated that Williams' workers' compensation claim had the potential to create heavy exposure and that Adams could not continue to pay Williams.  *See* Rec. Doc. 522, Ex. 2.  Adams terminated its policy with Midwest at about the same time because it could not maintain self-insured status. It was not until three years later, during which period Midwest

24

took no action, that Williams took a judgment against Adams declaring him to be permanently and totally disabled and entitled to weekly benefits indefinitely.  Further, although Midwest was given notice of the motion to accelerate benefits, it did nothing to defend it.  Indeed, Midwest admitted that its settled policy was to do nothing to aid in or handle the defense of claims against its insured regardless of whether the insured was insolvent and unable to put on a defense.  *See* Rec. Doc. 218, Ex. 9; Deposition of Matthew Jerabek at 48-51, 74-75.  Therefore, considering the record before the district court, we find that it did not err when it granted summary judgment against Midwest on the piercing corporate veil issue.

**III. Conclusion**

In light of the foregoing analysis, we AFFIRM all of the rulings of the district court, except for its order granting summary judgment against Midwest on the issue of whether Adams breached the insurance contract by failing to defend and settle Williams' claim.  We REVERSE and REMAND that issue alone to the district court.